JULIAN KENNEDY, JR.,

Complainant,

O'DONNELL ISELIN, O'DONNELL ISELIN and COLUMBUS O'DONNELL ISELIN, II, Trustees under Deed of Trust, dated April 26, 1932, for Lewis Iselin, Marie I. LaFarge, Adrienne M. Gilbert, LOUISE M. ISELIN, ERNEST ISELIN, JR., Executors of the Estate of Adrian Iselin, ERNEST ISELIN, Liquidating Partner of A. Iselin & Co., ADLIN CORPORATION COLUMBUS O'DONNELL, II, JOSEPH W. KENNEDY, KATHERINE W. KENNEDY, LOUISE KENNEDY, LOWBER GAS COAL COMPANY, and THOMAS W. KENNEDY,

Intervening Complainants,

*vs.*

EMERALD COAL AND COKE COMPANY, a Corporation of the State of Delaware.

*New Castle, October 5, 1942.*

*Houston Wilson,* of Georgetown, *E. Ennalls Berl,* of the firm of Southerland, Berl & Potter, of Wilmington, and *Leonard K. Guiler, Ralph H. Frank, and Frank R. S. Kaplan,* all of Pittsburgh, Pa., for complainant and intervening complainants.

*Caleb S. Layton,* of the firm of Richards, Layton & Finger, of Wilmington, and Thorp, Bostwick, Reed & Armstrong, of Pittsburgh, Pa., for respondent.

THE VICE-CHANCELLOR: Complainants (including the intervenors) protest against the execution of a plan relating to the financing of respondent, as in violation of their rights as shareholders. The features of the plan objected to are the issuance of 122,457 shares of respondent's capital stock to three corporations having interlocking directors with respondent; and respondent's entering into contracts with two of those corporations to supply them with a substantial portion of the coal it is expected to produce during the next

twenty years. The interlocking directors and the persons whom complainants charge with responsibility for fostering the plan are J. H. Hillman, Jr., a gentleman of long experience in the coal industry, and certain of his business associates. Complainants assert that the proposed issuance of shares is at an incredibly low price, that it would have the effect of diluting the value of the stock of the old stockholders, and of shifting voting control to Mr. Hillman and his associates, through corporations dominated by them. The Hillman group, or "interests", prior to the plan, held only about twenty per cent of the voting stock. The contracts are assailed as burdensome and unfair in that they would obligate respondent to furnish eighty per cent of the purchasing corporations' coal requirements, but would not obligate them to buy any coal; and in that respondent would be controlled by the consumers of its product, and thus would have, from the standpoint of the consumers, the advantages of a "captive" mine, without the responsibilities and possible disadvantages of operating respondent and mining its coal at their entire risk and expense. Complainants say that Mr. Hillman and his associates who, as directors and officers of respondent, attempt to carry through the proposed action, are dealing in effect with themselves, and are doing so unfairly, and that the methods they have chosen to accomplish their purpose constitute a "surprise attack". It is further contended that the contemplated action would violate an express undertaking of Mr. Hillman, made with respondent when he and his associates first became stockholders. Respondent controverts all of these complaints and charges.

Respondent was incorporated in 1908. Julian Kennedy, Senior, a distinguished mining engineer and father of the original complainant and one of the intervenors, was the principal organizer. The corporation issued its only class of capital stock at $100 a share. About eighty per cent of the stock was acquired by four groups of stockholders: the Kennedys, the Walkers, the Iselins, and Ohio Iron and Steel

Company. The remaining twenty per cent was purchased in small lots by various persons. Complainants are the present Iselin group and part of the Kennedy group.

The corporation (through a wholly owned subsidiary, since dissolved) acquired 9,869 acres of undeveloped coal lands in Greene County, Pennsylvania, at an average cost of approximately $283 an acre. Together these constitute a single coal field. It is in a region containing deposits of coal adapted to use in making steel because, among other things, of its low sulphur content. The steel mills near Pittsburgh, 67 miles distant from the coal field, are a logical market for "metallurgical" coal mined in the vicinity of the Emerald field.

From 1908 to 1930, the coal lands remained wholly un-developed. There was no mining operation on the tract, and the corporation had no income. During this period, substantial sums were expended for taxes, interest on borrowed money, and other purposes which may be classed as carrying charges. To provide funds to buy the lands and to pay the carrying charges, the corporation borrowed money, and also from time to time the four stockholder groups subscribed for shares of stock at $100 a share.

The year 1930 marked the advent of Mr. Hillman and the beginning of development of the Emerald properties. Mr. Hillman approached Mr. Kennedy, Senior, the then president of respondent, and submitted a proposition. He pointed out that the Emerald property had no river connection and hence, was not so valuable as coal land located along the nearby Monongahela River, which leads to the Pittsburgh area; the difference being attributable to the fact that the cost of transportation by railroad greatly exceeds the cost by river. He suggested that access to the river could be had by purchasing a small operating coal mine, The Edward mine, which adjoins a part of respondent's field and extends toward the river, and by acquiring a right of way of about two miles over land separating the Ed-

ward mine from the river. He stated that "The connecting up of the Emerald Block of coal with the river would greatly enhance the value of this property, and should put it in competition with coal for which others have paid $1,500.00 to $2,000.00 per acre"; that "It should make it very much more readily salable"; and further, that the acquisition of the Edward mine and the spending of $100,000 to $150,000 on it "would mean a development could immediately be begun for extending the headings of this property to the river on the one side, and a network into the Emerald field on the other side, so as to have, in a few months, a large capacity at this property." Mr. Hillman had an option to purchase the Edward mine for the price of $750,000 and was willing that the respondent should acquire the mine by the exercise of this option. He suggested the purchase of another mine to be used as "trading material" in acquiring the right of way. Mr. Hillman offered to buy 9,000 shares of respondent's stock at $100 a share, to supply the cash needed for the two purchases.

Respondent accepted the proposition and recommendations of Mr. Hillman, with some modifications. It bought the Edward mine, but not the other mine. As a result of negotiations carried on by Mr. Hillman, it acquired, in 1931, a right of way from the Edward mine to the river, in consideration of the payment of about $125,000 in cash and an agreement to pay a transportation or wheelage charge of $3\frac{1}{2}$ cents per ton for coal hauled over it. Besides the 9,000 shares which Mr. Hillman had agreed to take, additional 12,854 shares were also issued to the stockholders to provide funds to pay the existing corporate indebtedness of about $1,300,000. Mr. Hillman offered to subscribe for a proportionate number based upon his commitment for 9,000 shares. Pursuant to his request, all of the shares he had agreed to take were issued to Tower Hill-Connellsville Coke Company of West Virginia. Some years later, the shares were transferred to Hillman Coal and Coke Company. The

present holdings of that company are 11,939 shares. Respondent's total outstanding shares numbered 57,543, after the issuance of stock above described. Hence, the shares contracted for by Mr. Hillman represented about 20% of the total outstanding.

Mr. Hillman became the president and the active head of respondent. From 1930 to 1941, development activities were carried on, including the driving of a haulage entry to the river. Some coal was produced, but the development costs and carrying charges exceeded the receipts from coal mined. The mining operations are still in a developmental state. Funds were obtained principally by advances, from time to time, by Hillman Coal and Coke Company. As of March 1941, respondent had current liabilities exceeding $2,250,000. Of this, over $1,600,000 represented demand obligations owed to Hillman Coal and Coke Company. The current assets were $70,384.78. Indebtedness under a mortgage executed in 1937 exceeded $650,000.

At a meeting of the board of directors of respondent on December 5, 1940, a committee was appointed upon the suggestion of Mr. Hillman "to develop plans for the recapitalization of this Company and to report to a future meeting of the Board." · Of the five committee members, Messrs. Hillman, Affelder, Coulter, Adams and Joseph W. Kennedy (one of the intervenors), only the first two might be called "Hillman" men. In addition to the appointment of the committee, the directors approved certain construction contracts. At this meeting, Mr. Hillman reported that Pittsburgh Steel Company had made available a sum in excess of $332,000 and would provide an additional sum for the development and equipment of the Emerald mine; that as one of the inducements to Pittsburgh Steel Company, to make this money available, he had, on August 14, 1940, written a letter to that company, obligating respondent to furnish all or at least 80% of the company's high volatile

coal requirements for two of its mines for a period of twenty years. The directors approved this action.

The committee appointed by the directors did not meet as a whole, but on February 11, 1941, a plan formulated by Mr. Hillman was discussed with all of the members. The stated purposes of the plan were to get additional cash for development work, to interest large consumers of coal in the company, and to eliminate large amounts of current demand indebtedness. The plan contemplated that the company should issue 122,457 shares of its stock (thus increasing the total outstanding from 57,543 to 180,000) at $12 a share as follows:

| | |
|---|---:|
| 30,000 shares to Pittsburgh Coke and Iron Company | $ 360,000.00 |
| 30,000 shares to Pittsburgh Steel Company | 360,000.00 |
| 62,457 shares to Hillman Coal and Coke Company | 749,484.00 |
| 122,457 shares | $1,469,484.00 |

It was also proposed that, subject to the approval of the stockholders, the corporation should issue second mortgage bonds in the face amount of $796,000 to Hillman Coal and Coke Company in exchange for an equivalent amount of demand notes of respondent. The plan was acceptable to all members of the committee, except Mr. Joseph W. Kennedy.

The directors, at a meeting on February 18, 1941, approved the plan but directed that the shares to be issued should first be offered to the existing stockholders at the same price, $12 a share, and that a registration statement should be filed with the Securities and Exchange Commission relating to the offering of these shares; that the shares not subscribed for by the shareholders should be issued to the three corporations above mentioned; that a meeting of stockholders should be called to consider the execution of

a mortgage or· deed of trust so that second mortgage bonds might be issued to Hillman Coal and Coke Company.

A registration statement was filed and a prospectus relating to the offering of stock sent out to the stockholders on June 18, 1941. The time for stockholders to subscribe and pay for the shares was limited to ten days from June 18. The prospectus included information concerning the financial status of the company, its history, the proposed issuance to the three companies of shares not taken by the stockholders, and the interests of respondent's directors in these three companies. It described the offer of August 14, 1940, made to Pittsburgh Steel Company to supply it with coal, and stated that respondent proposed to make a similar offer to furnish coal to Pittsburgh Coke and Iron Company.

Upon the offering to shareholders, only one person subscribed for stock. He had owned six shares and subscribed for thirteen, to which he was entitled under the offer.

On June 24, 1941, the present suit was instituted to enjoin the issuance of shares to the three corporations at $12 a share, and to restrain the execution of a contract with Pittsburgh Coke and Iron Company, similar to the contract with Pittsburgh Steel Company.

On July 14, 1941, a special meeting of stockholders was held. The stockholders voted upon various questions, including the execution of a second mortgage and the issuance of bonds under it to Hillman Coal and Coke Company; the action of the directors in authorizing the sale of 122,457 shares of respondent's capital stock to the three corporations, subject to the prior rights of stockholders to purchase their pro rata number of shares; the action of the board in approving the irrevocable offer to Pittsburgh Steel Company; and the making of a contract to supply Pittsburgh Coke and Iron Company with not less than 80% of the high volatile coal requirements of one of its plants. Out of 57,543 shares, the total number outstanding, the holders of 47,071 were present in person or by proxy. 38,538½ shares

were voted in approval of the above matters, and 8,303½ shares were voted in disapproval. Thus, the transactions were approved by more than a majority of the stockholders not associated with Mr. Hillman, nor with the three outside companies concerned in the refinancing plan. This meeting was adjourned to July 21, 1941, and at that time the action of the stockholders at the July 14 session was approved by a slightly larger majority. The corporation has proceeded to carry out the refinancing plan.

A basic element of complainants' case concerns the domination of respondent by Mr. Hillman and his associates, and the relationship of this group to the other three companies involved in the plan. Since 1930, the management functions of respondent have been performed by officers of Hillman Coal and Coke Company. This company supplies office space and usual office facilities. Engineering services are furnished by the same corporation, on the basis of cost. Subsidiary or affiliated companies transport in barges coal produced by respondent, and sell supplies to the workmen or miners. No question is raised concerning charges made for any of these services; nor is it contended that the business and affairs of respondent were improperly administered (excluding, of course, the proposed issuance of stock and two contracts complained of).

For some time prior to the meeting of respondent's directors on December 5, 1940, three out of the seven directors were of the Hillman group. At that meeting, the resignation of Mr. Ernest Iselin was accepted, and for him, another Hillman nominee was substituted as a director. Then, for the first time, a majority of the board consisted of Hillman associates. The officers and directors of respondent who may be classed in this group were the following: Mr. Hillman, director and president; Mr. Affelder, director and vice-president; Mr. Sheets, director and treasurer; Mr. Leithead, director; Mr. Keifer, assistant secretary. They were also directors of Hillman Coal and Coke Company.

Messrs. Hillman and Sheets own more than a majority of the voting stock of J. H. Hillman and Sons Company. This corporation, together with Messrs. Hillman and Leithead, own about 80% of the voting stock of Hillman Coal and Coke Company (the holder of about 20% of respondent's stock). The two Hillman companies and Mr. Hillman together own directly, or through other controlled corporations, substantial minority interests in Pittsburgh Steel Company and Pittsburgh Coke and Iron Company. Although the facts leave some doubt, it appears that the aggregate of such holdings is something less than 40% in the case of Pittsburgh Steel Company, and less than 44% in the case of Pittsburgh Coke and Iron Company. Two of the twelve directors of Pittsburgh Steel Company are Hillman men. Mr. Hillman is one of these, and is a member of the executive committee. Mr. Hillman, Mr. Affelder and a Mr. Watson are three of the eight directors of Pittsburgh Coke and Iron Company. Messrs. Hillman and Affelder are two of the four members of the executive committee of Pittsburgh Coke and Iron Company.

The Hillman group, of course, dominates the activities and the affairs of Hillman Coal and Coke Company. It has likewise directed the activities of respondent for a number of years. Some of the group, notably Mr. Hillman himself, are in a position to exert a substantial influence with respect to the affairs of Pittsburgh Steel Company and Pittsburgh Coke and Iron Company, although it does not appear that absolute domination of these companies was or is exercised. By reason of the relationship of the majority of respondent's directors to the three other companies involved in the plan, they, or those who would uphold the plan, "assumed the burden of showing the entire fairness of the transaction." *Keenan v. Eshleman,* 23 Del. Ch. 234, 2 *A.* 2d 904, 908, 120 A. L. R. 227.

To arrive at a judgment of the fairness or unfairness of the particular plan here involved, we must begin by a

consideration of the circumstances surrounding the corporation during the period the plan was formulated and authorized. The coal fields had been for sale for about thirty years. Repeated efforts to sell them had been unavailing. Ten years after development was begun found the properties still undeveloped. The corporation was without income to meet either its carrying charges or development costs. The ratio of its current liabilities to current assets was about 32 to 1. Respondent was unable to secure funds for development from commercial sources. In 1938, an application for a loan had been made to the Reconstruction Finance Corporation. From this source $810,000 would have been available, but only upon condition that Hillman Coal and Coke Company should obligate itself to the full extent of the loan. In order to carry the operations out of the developmental stage, more money was needed. The corporation could hardly sit by and wait for something to happen. Plainly, the situation warranted action.

Complainants say that the refinancing plan would not solve respondent's problems for it would not result in eliminating all demand obligations, nor would it provide sufficient cash for complete development. The net proceeds from the issuance of stock and bonds, $2,247,709.05, were proposed to be applied as follows: $1,922,709.05 to the payment of demand obligations (leaving unpaid about $335,000) and $325,000 to permanent improvements, equipment, or advances by Hillman Coal and Coke Company after March 31, 1941. It is obvious that the immediate situation would be greatly improved; and with large coal consuming companies interested in respondent as stockholders and as purchasers of coal, respondent would be in a far better position to obtain additional funds to complete development. No other practicable plan has been proposed.

One possible course of action is suggested by complainants in the following quotation from their brief: "Complainants contend that this 'Hillman Interest' was allowed

to buy into the common stock of the Respondent during the year 1930 and to manage the affairs of the Respondent from that time hereto under an express understanding that that management would develop the properties as coal producing properties and carry the property until it could be sold or developed up to that stage where it could produce sufficient income to carry itself." The evidence compels a finding that there was no such understanding or undertaking, express or implied, on the part of any of the Hillman group. True it is, that the indebtedness was incurred during the period of the Hillman management, and in part for developmental projects initiated by that management, and that most of it was owed to corporations with which the management was associated. But these matters are not of themselves the subjects of objection. Indeed, complainants seem to have been content that the Hillman group should supply the money required for the purposes for which it was expended. Funds had been thus supplied, not for a brief period, but for ten years, including the depression of the 1930's. I cannot find that any of the circumstances present gave rise to an obligation or duty on the part of Mr. Hillman and his associates to continue to furnish funds, or to abstain from attempting to find someone else to help shoulder the burden they had carried in the past, and share in that burden which the future would inevitably bring.

Complainants charge that there is a gross disparity between the value of their stock and the price of $12 a share, at which the new stock is issuable under the plan; and hence, that an unfair dilution in value of the old stock will result. The circumstances of respondent's need for funds, and difficulty in obtaining them, direct the approach to the problem of determining the fairness of the issuance price of the new stock. The value of the old stock, and the value of the corporate assets, when the plan was authorized, are important considerations. But the aspect of value which demands primary recognition is value for the purpose of enabling

the corporation to raise money, by selling or leasing its property, borrowing, issuing stock, or otherwise. Theoretical factors of value are important in so far as they were able to induce action on the part of others.

The old stockholders were the persons whose interests would be adversely affected if the plan were unfair. The action which they took is a significant indication of the value of the old stock, and of the reflected value of the corporate assets, as well as of the fairness of the plan. As previously stated, when the corporation offered 122,457 shares to the existing stockholders, only one responded, and he subscribed for 13 shares. From the standpoint of the corporation seeking cash, it received from this source $156. By exercising their subscription privileges, the stockholders could have preserved their proportionate rights to the assets, and proportionate voting power. It would be only reasonable to expect that they, or a substantial number of them, would have subscribed, if they had considered that a gross disparity existed between the value of their stock and the issuance price of the new, as complainants contend.

Accordingly, it would seem proper to infer not only that the stockholders' voting rights were adequately protected by the opportunity afforded them to subscribe, but also that the value of the old stock was not enough greater than the price of the new to induce them to act; unless, as complainants contend, the offering was unfair in that it constituted a "surprise attack", and in that the long-term contracts were so onerous that they effectively discouraged subscriptions by stockholders. The "surprise attack" argument is based essentially upon the facts that, under the terms of the offering, stockholders were allowed ten days in which to subscribe, and that the rights were not assignable. Respondent says that the limitations were adopted for purposes of expedition and economy, and because it was thought improbable that the shareholders would want to exercise their rights. There is no proof that any shareholder

would have subscribed, or assigned his rights, but for these limitations. At the stockholders' meeting of July 14, 1941, Mr. Hillman stated that the three companies which had agreed to buy stock under the refinancing plan had indicated to him their willingness, notwithstanding the expiration of the subscription period, to sell to any stockholder the number of shares to which he would have been entitled during the period; that this offer was still open for a reasonable time; and that no objection would be made if any stockholder assigned his rights. No one made any attempt to subscribe. Thus, the shortness of the subscription period and the non-assignability of rights do not appear to have been substantial deterrents in this case.

Complainants' objection to the long-term contracts and their relation to the failure of stockholders to subscribe, may be considered together. Respondent asserts that "The alternative to securing a purchaser for the entire tract was to interest large consumers of coal in purchasing their requirements, or a substantial portion of their requirements, from respondent, thereby insuring the sale of coal produced and to persuade such consumers to take an investment position in the Company." It will be recalled that in the prospectus it is stated that respondent had made an irrevocable offer to Pittsburgh Steel Company to supply it with coal, and that respondent proposed to make a similar offer to Pittsburgh Coke and Iron Company. By reason of certain action of the Bituminous Coal Division of the Department of the Interior, the offer to Pittsburgh Steel Company and a form of contract with Pittsburgh Coke and Iron Company, approved by respondent's stockholders, are not now operative or effective. However, respondent proposes to enter into contracts with each of these corporations to carry out, generally, the original purpose. By amendment to the bill, complainants seek an injunction preventing the making of such contracts.

The terms proposed may be summarized thus: Respond-

ent, as seller, will agree to sell, and the buyer will agree to buy not less than 80% of the high volatile coal required each year, for twenty years, for the buyer's consumption at certain plants; the price to be fixed for the first year, and to be based upon competitive prices for subsequent years, with a provision for arbitration in the event of dissatisfaction.

Complainants object that neither purchaser will be obligated to buy any amount of coal, whereas respondent must hold itself in readiness to furnish substantially whatever the companies will require. This is a characteristic of so-called "requirement" contracts. It appears that industrial consumers usually do not enter into long-term contracts for definite quantities. Of course, the purchasers will be bound to buy at least 80% of their requirements. The coal consumption of one of the companies during the last ten years has been notably uniform.

It is urged that the contracts would make the mine undesirable to possible purchasers who would want, for their own purposes, the coal produced, since it is estimated that the purchases of the two contracting companies will require the mining of about 4000 tons per day. Production at that rate has not yet been attained at the Emerald mine, but it is presently intended to develop a daily production of 7000 tons. From past experience of unsuccessful attempts to find a purchaser and with no probable purchaser now in sight, the present objection is not determinative.

The evidence is persuasive that the possible handicaps of such contracts are outweighed by the benefits of having large buyers as steady customers. Complainants' expert, Mr. Opperman, testified: "The life of a mine or the success of a mine will depend upon the product being sold consistently to a responsible buyer." Numerous other witnesses considered the contracts beneficial.

The long-term contracts must be deemed fair, unless there is something objectionable in the fact that, under the

plan, the contracting purchasers will become shareholders, and thus acquire voting power. It is because of this result that complainants say that respondent will be reduced to a captive mine. There is evidence that the purchasers did not wish to participate in the plan unless they could acquire stock and also enter into the contracts. But, in any event, if the old stockholders of respondent had exercised their rights to subscribe for the stock issuable under the plan, the coal purchasing companies would not have acquired voting power. Since the stockholders did not see fit to act, I find no occasion to assume, and, of course, there is no proof, that the purchasers will exercise the voting power which they may acquire, unfairly or to the disadvantage of the other shareholders, and by so assuming prevent the consummation of the only workable plan that anyone has suggested.

The attitude of the stockholders who were not in any way associated with Mr. Hillman, is not to be gathered alone from their inaction. Two independent members of the board of directors, both of whom could speak as original stockholders, approved the plan. At the stockholders' meeting of July 14, 1941, after the offering to stockholders and after this suit had been brought, a majority of the independent stockholders approved the plan in all respects. It seems to me that any doubts concerning value of assets, value of stock to be issued, desirability of contracts, and fairness of the plan generally, are largely removed by the action of the stockholders themselves.

Apart from the acts of the stockholders, other tests of value of the old stock have been dealt with at length by the parties, and will now be discussed. Generally speaking, they either corroborate the fairness of the issuance price of the new stock, or fail completely to disprove its fairness.

The book value of the old stock was $99 a share. This does little more than reflect a record of the cost of the coal lands, plant and equipment, and the capitalization of carry-

ing charges and net development costs. It tells nothing of the willingness of buyers to buy—how much could the corporation get for the stock.

Respondent's stock was not listed on any securities exchange, and was not traded in, to any extent, at the time the plan was authorized. In 1930, and in previous years, the stock was issued at $100 a share. None was issued after 1930. Seventy shares were sold at $5 a share. One shareholder testified that he had tried to sell his stock for some time prior to 1941, but had found no purchasers. An officer of a corporate shareholder testified that he was advised by a broker, about the time of the offering of the new stock, that "there was a nominal value of $5 a share bid" for the stock. In 1941, there was a sale of over 10,000 shares at $12 a share. This sale, however, was after the plan had been adopted, and was undoubtedly affected by its provision. Although these facts relating to sales or attempted sales of stock furnish no determinative criteria of a fair issuance price, they do indicate that small lots of the stock were not in demand and were not traded in at prices exceeding the issuance price, within 10 years prior to the adoption of the plan.

The corporation was still in its developmental stage, and there is no satisfactory record of earning power to serve as a guide to value. Whatever the potential earning power might be, realization of income was, from the point of view of possible purchasers of the stock, contingent upon the future successful solution of grave financial problems facing the corporation. Clearly, these circumstances would tend to depress the value of the stock.

Complainants treat the problem of determining the fairness of the issuance price as primarily dependent upon the value of the corporate assets, and particularly the coal lands. The value of the assets must be considered in the light of the need of the corporation for funds, with the consequent qualification of theoretical elements of value previously

mentioned. Moreover, the following comments of Chancellor Wolcott in *Allied Chem. & Dye Corp. v. Steel & Tube Co.*, 14 *Del. Ch.* 64, 71-73, 76, 122 *A.* 142, 145, with reference to a fair selling price of corporate assets sold pursuant to what is now *Section* 65 *of the Delaware Corporation Law, Rev. Code of Del.* 1935 § 2097, are helpful here in considering the value of respondent's assets:

"What is a fair price for the majority in control of the corporation to accept for the assets, is a question of opinion. What is a fair price for which to sell property is always a matter of opinion. Opinions vary. In proportion to the distance the property in question is removed from the qualities of simplicity and common familiarity, the difficulty of ascertaining the question of its fair selling value is increased. * * *

"Furthermore, even if it should be that my own view should be that the price named is not full or adequate, yet the discrepancy between what I should conceive to be the fair one and the price named in the contract would have to be so great as to lead me to think that it is to be attributed not to a difference of opinion upon a highly debatable question, but rather to bad faith, before I would feel justified in continuing the injunction. * * *

"As I have above stated, the true value upon a sale to be attributed to the properties of the company is a matter of opinion. Opinions, however, to be worth while, must be sustained by some showing of facts and reasonable implications therefrom. Witnesses on both sides have expressed such opinions, but I decline to give these opinions any weight, except as the facts with all their reasonable intendments are calculated to sustain them. * * *"

For purposes of comparison, the parties are agreed as to a computation of value to be assigned to the coal lands, if the old stock be assumed to have had a value of $12 a share, the issuance price of the new stock. The computation is based upon the balance sheet of the corporation as of March 31, 1941, with $12 a share substituted for the book value of the stock, and with the book value of the coal lands, in their then state of development, eliminated. The resulting computed value of the coal lands, as then developed, is $238.49 per acre. Complainants say that this amount is very much less than the true value, and consequently, that

the value of the stock was proportionately greater than $12 a share. Respondent contends that the computed value represents the fair, actual value of the coal lands, and that therefore, the price of $12 a share reflects a fair value of the coal lands.

Four of respondent's witnesses, including Messrs. Hillman and Affelder, fixed the fair average value of the coal lands at prices between $238.49 and $250 per acre. The showing of facts to sustain the opinions must be examined.

The book value per acre is about $715. This is based upon a total cost of $3,495,520.97, capitalized carrying charges of $3,053,688.75, and capitalized development costs (excluding plant and physical equipment) of $956,104.89. The comments with respect to the book value of the stock are applicable to the book value of the lands.

The average tax assessment value for the year 1941 for the entire tract was $144.35 an acre. Since 1937, ten small interior tracts of coal land have been sold. Some of these are within the boundaries of respondent's field and others are near by. Half of them had been taken over by taxing authorities and later sold. The tracts vary in size from 6 to 281 acres; and in price from $17.72 to $197.40 per acre. The total acreage is 1020 acres, and average selling price, $79.29 an acre. Respondent offered evidence of value of several adjoining, undeveloped tracts of coal lands of greater size, none of which has connection with the river. One parcel, of 2900 acres, is under option at the price of $50 an acre. Three separate tracts containing, in all, 8500 acres were sold for taxes in 1931, subsequently redeemed, and resold at a price of about $52 an acre. Three other tracts, aggregating 2375 acres and owned by Hillman Coal and Coke Company, were under option in 1938 at $250 an acre, subject to a commission of $12.50 an acre. The option was not exercised. Although many differences in surrounding conditions must be taken into account, the

foregoing facts are consistent with the computed valuation of $238.49 per acre for the Emerald field.

The McCook tract of 514 acres of undeveloped coal lands located on the river about seven miles from respondent's field was sold, in 1940, by Pittsburgh Steel Company, at a price of $748 an acre. Mr. Hillman negotiated this sale and arranged that the proceeds should be used to buy that part of respondent's stock issuable to Pittsburgh Steel Company under the plan. Complainants point to this sale as evidence of a high value of the Emerald field. In fact, based upon certain testimony concerning high sulphur content of coal near the McCook tract complainants argue that the Emerald field contains a better grade of coal, and consequently, that the Emerald is more valuable. Respondent, on the other hand, finds factors to account for a much higher sales price for the McCook tract than could be obtained for the Emerald. The McCook tract adjoins a mine of the purchaser and is accessible to entries driven up to the boundary of the field. While the property was undeveloped from the standpoint of the seller, Pittsburgh Steel Company, it could be readily mined, and hence, was especially desirable to the purchaser. Drill hole tests disclosed that the thickness of the coal seam was about two feet greater than in the Emerald field, and indicated that the coal was of low sulphur content. There is, of course, no wheelage charge payable for coal mined from the McCook tract as in the case of Emerald. The average length of haul required to bring the coal out of the mine is considerably shorter. The roof conditions in the mine are such as to justify a lower wage rate than in respondent's mine. The price of the McCook tract cannot be used as a measure of value of the Emerald field without making some adjustment for the dissimilar circumstances. Such an adjustment, it seems to me from the evidence, would fairly result in a substantially lower valuation of the Emerald lands.

A lease in 1940 of the Rainey mine, which adjoins the

Emerald field, offers greater possibilities as an indication of value. The mine was leased by Republic Steel Corporation on a royalty basis of 18 cents per ton of coal mined over a period of twenty-five years, with an option to purchase the equipment and 5,000 acres of coal lands at the price of $4,500,000. By deducting a fair appraised value of the equipment, respondent computes the value attributable to the coal lands to be $604.45. Although challenged by complainants, this valuation seems reasonable and proper. Based on this value of the Rainey lands, respondent argues that the value of the Emerald field is less than $200 an acre because of disadvantages which it has when compared with the Rainey property.

The Rainey tract being directly on the river, no wheelage charge is payable for access to the river. The average length of haul of mined coal in the Emerald mine is 6.78 miles, and in the Rainey mine 3.69. Respondent has attempted to compute the monetary amount of the disadvantages or burdens of the wheelage charge and the longer average haul in the Emerald mine, when compared with the Rainey mine. This computation shows the total burden of the Emerald field to be $429.64 per acre. Deducting this amount from the value of the Rainey field, $604.45 per acre, in order to make an adjustment for the additional costs which Emerald must pay to get its coal to the river, leave a resultant comparable value of $174.31 per acre for the Emerald field.

Complainants dispute this adjustment on several grounds, one of which is that respondent's computation fails to take into account the fact that the Rainey field comprises 5000 acres whereas the Emerald tract contains 10,500. Complainants suggest a computation by which they attempt to give effect to the difference in size. Based upon the value of $604.45 per acre for the Rainey land, the result of complainants' computation gives the Emerald field a value of $314.40 per acre. While neither computation may be ac-

cepted as an exact measure of the difference in value of the two fields, I am, nevertheless, convinced that the wheelage charge and longer average haul in the Emerald mine are factors which justify a substantially lower valuation of Emerald than of Rainey.

As to the fact that the Emerald field is about twice as large as Rainey (aside from its effect upon a computation of the amount of the burdens), it appears that both fields are large enough to permit efficient operation, and I am unable to conclude that the difference in size, considered alone, would affect the relative value per acre. It is noteworthy, however, that the officer of Republic Steel Corporation who was active in negotiating the Rainey lease, testified that the executives of his company had considered the Emerald mine at the time of the negotiations for Rainey; and that they had rejected Emerald because, among other reasons, it was decided that Emerald was too large for Republic to carry.

Respondent points to other conditions which tend to show a greater value of the Rainey field. The Rainey mine is in a productive stage and is actually producing 6000 tons per day, as compared with respondent, in the development stage, with a present daily production of 2700 tons. The Rainey mine is nearly completely developed to its boundary lines, and hence, more accurate information as to the quality of its coal is available than in the case of the Emerald mine. The high sulphur content of coal in an adjoining tract, and the discovery of small areas of such coal in the Emerald field itself, cast some suspicion concerning the quality of the extensive untested portions of the field. Because of the further development of Rainey, the area of less desirable coal deposits can be more certainly estimated, and has been estimated to be unimportant in size. Giving effect to the contrasting conditions of the two mines, the computed value of $238.49 per acre of the Emerald field seems within the

range of fair estimates which may reasonably be deduced from the Rainey transaction.

From the evidence thus far, respondent has sustained its contention that the issuance price of the stock and the long-term contracts are fair. Complainants' evidence of value of the coal lands remains to be considered.

Joseph W. Kennedy, one of the intervenors, testified that the Emerald field has a value of $1000 an acre. This estimate seems to be based primarily upon opinions of various persons in 1930, and upon the ground that "if it was worth $1000 then it is surely worth it today." The witness stated that the valuation is in part based on the Rainey lease and the lease of a property known as the Gibson mine, but there is no satisfactory explanation of how these transactions support the valuation of $1000. It is plain that Mr. Kennedy, in his valuation, assumes the favorable happening of numerous contingencies, with little regard to recent transactions.

Complainants called a mining engineer who testified to a value of $800 per acre. He arrived at this figure in three steps. Step 1: Computing the value of the estimated recoverable coal on the basis of a royalty of 30c per ton, over a period of forty-two years, he obtained a value of $722.48 per acre. Step 2: Comparing the Emerald and the Rainey mines, he computed a sum representing the monetary disadvantage of Emerald, due to the longer haul, which he deducted from $722.48, leaving a value of $404.97 per acre. This he called the value of the Emerald coal in place as compared with the Rainey coal. Step 3: He then added to the Step 2 value of $404.97, the sum of $403.71, which he estimated to be the monetary advantage per acre arising out of the fact that the Emerald mine has access to the river. He thus obtained the final valuation figure of $808.68 per acre. It seems to me that this process of deduction is somewhat confused. The results obtained when the appraisal is

compared with the Rainey transaction are not sufficiently explained, and appear to be incongruous.

In contending for a high value of the Emerald field, complainants rely heavily upon three considerations: the advantage of access to the river; the asserted near exhaustion of coal fields on the Monongahela river; and the evidence of high prices in transactions in 1930 and before. They say in their brief: "Our case is more strongly supported by the testimonials of the Hillman interests and of those men who formed an integral part of its organization than by our own witnesses." Complainants repeatedly allude to matters appearing in the record and testimony of *Tower Hill-Connellsville Coke Co. v. Piedmont Coal Co.*, (4 *Cir.*) 64 *F. 2d* 817, 91 *A. L. R.* 648. That case was tried in 1931, and it was to the interest of Mr. Hillman and his associates to demonstrate that in 1930 the coal lands and stock of respondent had a high value. In the answers and testimony, and in other connections, various members of the Hillman group, including Messrs. Hillman, Affelder and Sheets, estimated values ranging from $1000 to $2000 per acre; asserted that a river connection should make a coal field more valuable, to the extent of $500 to $800 per acre, than coal fields depending solely on rail transportation; pointed out the superior quality of the coal deposits of the Emerald field as well as the scarcity and near exhaustion of the metallurgical coal reserves in the area; and asserted other reasons why the Emerald field had a value of at least $1000 per acre in 1930.

To justify the present refinancing plan which reflects a value of $238.49 per acre for the coal lands, in face of the earlier statements by the Hillman group supporting a valuation of $1000 or more, Messrs. Hillman and Affelder testified that intervening events and circumstances had changed their views. Among the factors mentioned are the depression of the 1930's, and particularly the years following 1930; the failure to find a buyer for the mine despite repeated

efforts during eleven years; the fact that in 1939 the then operator of the Rainey mine became a voluntary bankrupt; the unionization of coal mines in this district in 1933 and a consequent increase in cost of production; the discovery of facts about the unfavorable quality of coal in certain areas of the field; the decline in values evidenced by certain tax sales and options relating to smaller tracts. It does not seem to me unreasonable that these facts should account for the differences between the opinions of values of 1930 and of 1941.

But complainants say that Messrs. Hillman and Affelder have, until the eve of the announcement of the refinancing plan, reasserted a high value of the Emerald field, and factors showing its value, all of which are inconsistent with their present statements concerning a change of opinion. Complainants refer particularly to certain correspondence between Mr. Hillman and the Kennedys in 1936, matters contained in the application to the Reconstruction Finance Corporation, in 1938, for a loan (the application is signed by Mr. Hillman and an exhibit is signed by Mr. Affelder), and statements of Mr. Hillman in a letter to Pittsburgh Steel Company dated February 6, 1941. From the 1936 correspondence, I find nothing more than a reaffirmance of a high value of the coal field (and of respondents' stock) in 1930, under the conditions then existing or believed to exist. The R. F. C. application includes two appraisal reports of engineers, written in 1931, which estimate a value of $1000 per acre. In exhibits attached to the application, it is stated that certain mines of large coal consuming industries will soon be exhausted; that "Operators and engineers concede that coal land available for river shipment is valued at from $500 to $750 per acre more than coal land with facilities for rail shipment only." The application contains a statement of land purchases from 1909 to 1930, the average prices varying from $628 to $1894. In the February, 1941 letter to Pittsburgh Steel Company, Mr. Hill-

man refers to purchases of coal lands at high prices, and to the superior quality of Emerald coal, and states: "Since the Rainey properties were disposed of to Republic Steel Corporation on September 1, 1940, we know of no river mine other than Emerald Mine that can meet the tonnage and quality requirements of Pittsburgh Steel Company."

The apparent inconsistencies between past and present statements of Messrs. Hillman and Affelder are in large measure explained in their testimony concerning a change of opinion. It is doubtless true that when application was made to the R.F.C. for a loan to respondent, and when Mr. Hillman negotiated with Pittsburgh Steel Company to solicit its aid for respondent, they stressed certain factors of value which they now relegate to a position of unimportance. Regardless of the assertions as to the weight which these factors of value should receive, it must be remembered that substantially the same factors were operative in the case of the Rainey mine when it was leased. Their effect has thus been measured in an actual recent transaction. As thus measured, they have been taken into account in the comparison of Emerald and Rainey. Any unexplained inconsistencies in the statements referred to seem to me wholly insufficient to demonstrate that the value of the coal lands was so great that the issuance price of the new stock was unfair.

Upon a consideration of the evidence, I find that the plan is fair, and that the prayers for an injunction should be denied. To avoid further prolixity, I shall not discuss numerous points which, in the view I have taken, would not change the ultimate conclusion. For the same reason, I shall not pass upon respondent's motion to strike certain testimony from the record.

A decree dismissing the bill will be advised.