JULIAN KENNEDY, JR.,

Complainant,

O'DONNELL ISELIN, O'DONNELL ISELIN AND COLUMBUS O'DONNELL ISELIN, II, Trustees under Deed of Trust, dated April 26, 1932, for Lewis Iselin, Marie I. LaFarge, and Adrienne M. Gilbert, LOUISE M. ISELIN and ERNEST ISELIN, JR., Executors of the Estate of Adrian Iselin, ERNEST ISELIN, Liquidating Partner of A. Iselin & Co., ADLIN CORPORATION, COLUMBUS O'DONNELL ISELIN, II, JOSEPH W. KENNEDY, KATHERINE W. KENNEDY, LOUISE KENNEDY, LOWBER GAS COAL COMPANY, and THOMAS W. KENNEDY,

Intervening Complainants,

*vs.*

EMERALD COAL AND COKE COMPANY, a corporation of the State of Delaware.

*Sussex, December 8, 1943.*

*Houston Wilson, E. Ennalls Berl,* of the firm of Southerland, Berl, & Potter, and *Ralph H. Frank,* of Pittsburgh, Pa., for petitioners.

*Caleb S. Layton,* of the firm of Richards, Layton & Finger, and *Thorp, Bostwick, Reed, & Armstrong,* of Pittsburgh, Pa., for respondent.

PEARSON, Vice-Chancellor: The gist of the petition is that after the final decree was entered the petitioners discovered new evidence which they could not have discovered at the time of the hearing by the exercise of reasonable diligence; and that if they are permitted to adduce that evidence at a rehearing, it will probably change the result of the case, so that they will obtain the relief previously denied them. The respondent opposes the filing of the bill of review.

After presenting the application, but before it was argued, petitioners (complainants) took an appeal to the Supreme Court from the decree entered in this case. The pendency of the appeal was not urged as an objection to the application and was not discussed. The propriety of considering the application during such pendency will be assumed, there being some authority to support it. *Ruley v. Foley, et al.,* 54 *W. Va.* 493, 46 *S.E.* 348; 30 *C.J.S., Equity,* § 636, *pp.* 1052, 1053; compare: *In re Missouri-Kansas Pipe Line Co.,* 24 *Del.Ch.* 315, 10 *A.2d* 500.

The facts and contentions of the parties at the final hearing of the cause; and the reasons for the dismissal of the bill are set forth in the earlier opinion (26 *Del. Ch.* 302, 28 *A. 2d* 433). The first paragraph of that opinion contains a gen-

eral statement of the principal points in controversy as follows:

"Complainants (including the intervenors) protest against the execution of a plan relating to the financing of respondent, as in violation of their rights as shareholders. The features of the plan objected to are the issuance of 122,457 shares of respondent's capital stock to three corporations having interlocking directors with respondent; and respondent's entering into contracts with two of these corporations to supply them with a substantial portion of the coal it is expected to produce during the next twenty years. The interlocking directors and the persons whom complainants charge with responsibility for fostering the plan are J. H. Hillman, Jr., a gentleman of long experience in the coal industry, and certain of his business associates. Complainants assert that the proposed issuance of shares is at an incredibly low price, that it would have the effect of diluting the value of the stock of the old stockholders, and of shifting voting control to Mr. Hillman and his associates, through corporations dominated by them. The Hillman group, or 'interests', prior to the plan, held only about twenty per cent of the voting stock. The contracts are assailed as burdensome and unfair in that they would obligate respondent to furnish eighty per cent of the purchasing corporations' coal requirements, but would not obligate them to buy any coal; and in that respondent would be controlled by the consumers of its product, and thus would have, from the standpoint of the consumers, the advantages of a 'captive' mine, without the responsibilities and possible disadvantages of operating respondent and mining its coal at their entire risk and expense. Complainants say that Mr. Hillman and his associates who, as directors and officers of respondent, attempt to carry through the proposed action, are dealing in effect with themselves, and are doing so unfairly, and that the methods they have chosen to accomplish their purpose constituted a 'surprise attack'. It is further contended that the contemplated action would violate an express undertaking of Mr. Hillman, made with respondent when he and his associates first became stockholders. Respondent controverts all of these complaints and charges."

It was held that under the circumstances, the issuance price of the new shares and the proposed contracts were fair and not in violation of the rights of complainants as shareholders.

The newly discovered evidence consists of testimony and exhibits introduced at a hearing held in Washington in January, 1943, before an examiner of the Bituminous Coal Di-

vision of the United States Department of the Interior. The hearing was upon an application of the respondent Emerald Coal and Coke Company for approval of one of the long term contracts mentioned above, and upon objections to the application made by certain of the petitioners here. Petitioners also allude to various financial statements of respondents as newly discovered evidence. They contend that testimony and statements of respondent's officers, directors and counsel at the Washington hearing and *"the composite result"* of this evidence *"considered as a whole"* constitute admissions of respondent, and of the Hillman group who put forth the refinancing plan, and are inconsistent with evidence and with the position of the respondent and the Hillman group at the trial in Wilmington. This case will be tested in the light of rules governing applications for leave to file bills of review, laid down by our Supreme Court in the case of *In re Missouri-Kansas Pine Line Co.*, 23 *Del.Ch.* 215, 224, 2 *A.2d* 273, 278, as follows:

"The applicant is required to show that the newly discovered evidence has come to his knowledge since the trial; that it could not, in the exercise of reasonable diligence, have been discovered for use at the trial; that it is so material and relevant that it will probably change the result if a new trial is granted; that it is not merely cumulative or impeaching in character; and that it is reasonably possible that the evidence will be produced at the trial."

The alleged newly discovered evidence is discussed under the following headings in petitioners' brief:

1. The value of respondent's coal lands as affected by the availability of other sources of supply.

2. The quality of coal in the Emerald field.

3. Value of coal acreage as calculated from comparative costs of loading coal on the river.

4. Hillman's purpose in acquiring an interest in Emerald.

5. The reason for the non-development of Emerald from 1930 to 1940.

6. Entry development.

7. The sale of Emerald's coal at a loss.

8. Emerald a captive mine.

It seems to me plain that the matters included under items 3, 4 and 5 do not contradict, as petitioners contend, and are not inconsistent with respondent's evidence and position at the Wilmington hearing. The "new evidence" falls far short of being so material and relevant as to make probable a change in the result of the case, if introduced at a new hearing; and a detailed discussion of it would serve no useful purpose. The same conclusions are applicable to items 2, 7 and 8, with the following additional comments. Under item 2, it is contended that certain Washington testimony negatives unfavorable inferences, which might be drawn from evidence at the Wilmington trial, as to the quality, and hence value, of the Emerald coal. Part of that Washington testimony concerns the effect of the coking process upon organic sulphur present in coal. It does not appear that petitioners were unaware of this effect at the time of the Wilmington trial or that it is in any sense newly discovered evidence. In item 7, petitioners bring up matters which are rather the subject of a separate suit than of this one. Furthermore, they complain about sales of coal at less than the cost of production, without reference to the market price, or without reference to whether there is anyone who would buy the coal for more than is being paid for it. In item 8, the question raised by petitioners resolves itself into whether respondent should be denominated by the abstraction "captive mine" by reason of the stock holding and contract relations between respondent and other corporations. Since the actual relations are reasonably clear, the characterization is unimportant. Moreover, the discussion

of the "captive mine" argument in the prior opinion is dispositive of petitioners' present contention.

In item 6, petitioners refer to Washington testimony which indicates that the aggregate mileage of developed entries in the Emerald mine in June, 1941, was 62 miles, and not 42, as stated in the prospectus prepared and used in connection with the refinancing plan and referred to in the previous opinion. The context indicates that the erroneous statement was not an intentional misrepresentation and its importance as affecting the ultimate result of this case has not been demonstrated.

In item 1, petitioners say that respondent, under control of the Hillman "interests", attempted to depreciate the value of the Emerald lands by testimony at the Wilmington hearing relating to the availability of other coal lands. Petitioners point to Wilmington testimony that the Hillman group could have supplied coal called for under the proposed contract between respondent and Pittsburgh Coke and Iron Company from sources other than Emerald; testimony that a letter from Hillman to Pittsburgh Steel Company stating that Hillman knew of no river mine other than Emerald that could meet the tonnage and quality requirements of Pittsburgh Steel Company was "a pretty good job of salesmanship"; testimony of Hillman that various sources of coal were available in 1940 which were unavailable in 1930 (offered as part of his explanation why he was no longer of the view, expressed by him in 1930, that "It is generally conceded by appraisers that River coal is worth five hundred to eight hundred dollars per acre more than rail coal").

Although the Washington testimony picked out by petitioners at first seems inconsistent in some respects, most of the inconsistencies disappear upon a careful reading of the entire relevant portions of the testimony at each hearing. The alleged inconsistencies, except in unimportant details, relate to matters of opinion or prognostication which were

by no means determinative of the ultimate decision here. I recall no suggestion in the Wilmington testimony that the proposed contracts were deemed otherwise than desirable from the standpoint of Pittsburgh Coke and Iron Company and Pittsburgh Steel Company. The suitability of the Emerald mine as a source of supply for the needs of these companies, the absence of other equally suitable single mines, and the difficulty which the Hillman group might have had in furnishing coal called for under the proposed contracts, all tend to show desirability of the Emerald lands, and hence, a reason why they should have monetary value. But these evidences of value do not answer the question whether the plan of financing defendant was fair. They are theoretical factors of value which were insufficient to induce anyone, including respondent's stockholders, to pay more than $12 a share for the new stock. Petitioners dichotomize persons concerned with the affairs of respondent as the Hillman and non-Hillman interests. They would lay at the door of the Hillman group full responsibility for not making a better bargain in refinancing the company. And yet, a majority of the committee appointed on December 5, 1940, to develop a plan of recapitalization were non-Hillman members, and until that day a majority of the board of directors were non-Hillman members, and until the new shares were issued in 1941, a large majority of the stockholders were of the non-Hillman group. It does not appear that the non-Hillman group came forward with financial assistance, or with definite offers of others to purchase or lease the property, or loan money to the corporation, or with any practicable plan of refinancing. Surely, it is not unreasonable that the remoteness of realization of income, coupled with existing financial difficulties and a long history of repeated demands for additional capital, should account in large measure for a relatively low evaluation of the stock in the minds of those who might be willing to risk their money in the venture. Not finding the issuance price so low as to be shocking, and bear-

ing in mind the circumstances, I am at a loss to see how this court could properly forbid the issuance of the stock or compel anyone to pay more for it.

After a consideration of the entire petition, I conclude that petitioners have failed to meet the requirement of showing that the new testimony would probably change the result of the case. The petition should, therefore, be dismissed.

An order accordingly will be advised.