JULIAN KENNEDY, JR.,

Complainant Below,

AND O'DONNEL ISELIN; O'DONNELL ISELIN AND COLUMBUS O'DONNELL ISELIN, *II*, Trustees Under Deed of Trust, Dated April 26, 1932, for Lewis Iselin, Marie I. Lafarge, and Adrienne M. Gilbert; LOUISE M. ISELIN and ERNEST ISELIN, JR., Executors of the Estate of Adrian Iselin; Ernest Iselin, Liquidating Partner of A. Iselin & Company; ADLIN CORPORATION; COLUMBUS O'DONNELL ISELIN, II; JOSEPH W. KENNEDY; KATHERINE W. KENNEDY; LOUISE KENNEDY; LOWBAR GAS COAL COMPANY; AND THOMAS W. KENNEDY,

Intervening Complainants Below,
Appellants,

*vs.*

EMERALD COAL AND COKE COMPANY, a corporation of the State of Delaware,

Respondent Below,
Appellee.

*Supreme Court On Appeal, December 9, 1944.*

408

LAYTON, C. J., RICHARDS, RODNEY, SPEAKMAN and TERRY, JJ., sitting.

*Houston Wilson,* of Georgetown, *William S. Potter,* of

Wilmington, and *Ralph H. Frank*, of Pittsburgh, Pa. (Leonard K. Guiler and J. P. Fife, both of Pittsburgh, and Southerland, Berl & Potter, of Wilmington, of counsel), for appellants.

*Richards, Layton & Finger*, of Wilmington, and *Thorp, Bostwick, Reed & Armstrong*, of Pittsburgh, Pa. (Earl F. Reed, of Pittsburgh, Pa., Caleb S. Layton, of Wilmington, and Charles M. Thorp, Jr., of Pittsburgh, Pa., of counsel), for appellee.

LAYTON, Chief Justice, delivering opinion of the court:

The court has before it an appeal from a decree of the Court of Chancery for Sussex County dismissing the complainant's bill of complaint; an appeal from a decree of the same court dismissing a petition for leave to file a bill of review on the ground of after discovered evidence; and a petition filed in this court for leave to amend a proposed bill of review.

The complainant and intervenors are stockholders of Emerald Coal and Coke Company, the respondent, incorporated in this State in 1908. By the bill of complaint it was sought to enjoin, as being in violation of rights of stockholders, the consummation of a plan of financing whereby 122,457 shares of the respondent's stock were proposed to be issued to three corporations having interlocking directors with the respondent, namely Hillman Coal and Coke Company, Pittsburgh Steel Company, and Pittsburgh Coke and Iron Company; and also to enjoin the execution of contracts with the last two named companies to supply them with a substantial part of the coal the respondent expected to produce during a period of twenty years.

The Vice-Chancellor, before whom the cause was heard,

after a lengthy hearing and elaborate argument orally and by briefs, advised dismissal of the bill of complaint in an opinion reported in 26 *Del.Ch.* 302, 28 *A.2d* 433, and a decree of dismissal was entered on November 22, 1943.

Briefly, the material facts are these. Julian Kennedy, Sr., father of the complainant and of one of the intervenors, was active in the formation of the respondent corporation. The original capitalization was 15,000 shares of stock of a par value of $100.00 a share. From time to time, however, the capitalization was changed by charter amendment, and in 1938, the authorized capital was 500,000 shares of no par stock.

In 1908, the respondent acquired about 10,000 acres of undeveloped coal lands, situated in Greene County, Pennsylvania, for $2,790,000.00, or about $283.00 an acre. Subsequent purchases were made increasing the acreage to over 11,000 acres, containing an estimated 83,850,000 tons of recoverable coal. From 1908 to 1930, the respondent was inactive. No development work was undertaken and no coal was mined. The corporation had no source of income whatever. Certain expenses constantly accrued. Carrying charges, including taxes and interest on borrowed money, were met by stock subscriptions by the stockholders at par; and these charges and expenses were capitalized and added to the original investment. In 1941, the carrying charges amounted to about $3,000,000.00.

In 1930, J. H. Hillman, Jr., an experienced operator in coal lands, became interested in the respondent's coal lands. He knew Julian Kennedy, Sr., then the respondent's president, and submitted to him a plan of development which contemplated the purchase of an adjoining mining property, known as the Edward mine, upon which he held an option, lying between the respondent's field and the Monongahela River, and the acquirement of a right of way over the Frick property which, in turn, lay between the Edward mine and the river, thereby affording to the respondent's field water

transportation and eliminating a serious marketing handicap. Mr. Hillman proposed also to purchase 9000 shares of the respondent's stock at par.

The plan, with some modifications, was found acceptable. The Edward mine was bought, and the right of way acquired for a cash consideration and a wheelage charge of 3½ cents a ton for coal hauled over the right of way. In addition to the 9000 shares of stock bought by Mr. Hillman, 12,854 shares were issued to the stockholders at par to provide funds to discharge corporate indebtedness, and Mr. Hillman subscribed for and accepted a proportionate number of these shares. All of the shares bought by Mr. Hillman were finally transferred to Hillman Coal and Coke Company, a Hillman corporation, which at the time of the trial, owned 11,939 out of a total issue of 57,543 shares of the respondent's stock, or approximately 20%.

In 1930, Mr. Hillman was made president of the respondent, and thereafter directed its affairs. Hillman Coal and Coke Company, through its officers and personnel, conducted the respondent's business, supplied office space, engineering services at cost, transported coal through subsidiaries and sold supplies to workmen and miners. From 1930 to 1941, some development work was done, and some coal mined and sold, but never in an amount sufficient to cover the costs. Money was obtained principally through advances made by Hillman Coal and Coke Company, and as of March 1, 1941, the respondent had current liabilities exceeding $2,225,000.00, of which amount over $1,600,000.00 was evidenced by demand notes held by the Hillman corporation. There was also a mortgage debt of $656,000.00. The current assets were slightly in excess of $70,000.00; and the ratio of current liabilities to current assets was 32 to 1. The financial condition of the respondent was most serious.

For some time prior to December 5, 1940, three of the seven directors of the respondent corporation were to be classed as Hillman representatives. At a meeting of the

board held on that date, Ernest Iselin, who had been a member for ten years without ever having attended a board meeting, resigned; and on motion of the complainant, Joseph W. Kennedy, J. M. Leithead was elected to fill the vacancy, thereby for the first time giving the Hillman group a majority of the board membership.

At this meeting the financial condition of the company was considered. Mr. Hillman stated that Pittsburgh Steel Company had advanced a large sum of money, and would advance more, for the development and equipment of the respondent's mine, and that as one of the inducements he had on August 14, 1940, addressed a letter to that company, obligating the respondent to furnish all or at least 80% of the company's high volatile coal requirements for two of its steel plants for a period of twenty years. This action was approved by the board of directors. Upon Mr. Hillman's recommendation a committee of five, of which two members only were of the Hillman group, was appointed to prepare a plan of refinancing, and subsequently Mr. Hillman submitted a plan which proposed to obtain additional needed money for development work, to eliminate to a great extent the company's current demand indebtedness, and to interest large consumers of coal in the respondent, by issuing 122,457 shares of stock at $12.00 a share, of which 30,000 shares were to be sold to Pittsburgh Steel Company, a like number to Pittsburgh Coke and Iron Company, and 62,457 shares to Hillman Coal and Coke Company. It was also proposed that the respondent issue second mortgage bonds in the amount of $796,000.00 to Hillman Coal and Coke Company in exchange for the same amount of the respondent's demand notes held by that company. The committee did not meet as a whole, but the plan was discussed with all of the members and was acceptable to all of the members of the committee except Joseph W. Kennedy. At a meeting of the board of directors held on February 18, 1941, the plan submitted by the committee was approved in its essentials; but it was decided that the new shares should be first offered

to the existing shareholders at the same price of $12.00 a share, the right to subscribe therefor nonassignable and limited to ten days; that a registration statement relating to the offering of the shares should be filed with the Securities and Exchange Commission; that the shares not subscribed for should be issued to the three named corporations; and that a meeting of the stockholders should be called to consider the execution of a second mortgage to secure the bonds to be issued to the Hillman Coal and Coke Company.

Mr. Hillman and his associates controlled Hillman Coal and Coke Company. He and an associate were directors of Pittsburgh Steel Company, Mr. Hillman being a member of the executive committee of the board of directors. Mr. Hillman and two associates were directors of Pittsburgh Coke and Iron Company, and he and one of his associates were two of the four members of the executive committee of that company's board. While the Hillman interests did not, as it appears, control the two companies, they undoubtedly exercised a large influence in their affairs.

A meeting of the stockholders was called to consider the plan of refinancing and the execution of a second mortgage. A prospectus was prepared and sent to the stockholders, on June 18, 1941, informing them of the financial condition of the company, the proposed issuance of the new shares not subscribed for by existing shareholders to the three companies, the interests of the respondent's directors in these companies, the offer of August 14, 1940 to Pittsburgh Steel Company relating to supplying it with a large part of its high volatile coal requirements for twenty years, and that a similar offer would be made to Pittsburgh Coke and Iron Company.

On June 24, 1941, the complainants filed their bill of complaint. On July 14 following the stockholders' meeting was held at which the holders of 47,071 shares out of 57,543 outstanding shares were present in person or by proxy. 38,303½ shares were voted in approval of, and 8,303½

shares against the action of the board of directors authorizing the sale of the new shares to the three companies subject to the subscription rights of the stockholders, the action of the board approving the offer to supply coal to Pittsburgh Steel Company, the making of a similar contract with Pittsburgh Coke and Iron Company, and the execution of a second mortgage to secure the bonds to be issued to Hillman Coal and Coke Company.

One stockholder only, owning six shares, had exercised his right to subscribe for the new stock, he subscribing for thirteen shares. Objection was made by the complainants that the ten-day limitation imposed for the exercise of subscription rights was too short a time for a considerate exercise of the right, and objection was also made to the provision against assignment of the rights. Thereupon, an offer was made that the three companies would, for a reasonable time, sell at $12.00 a share to any stockholder the number of shares to which he would have been entitled to subscribe, and that no objection would be made to an assignment of subscription rights. And, at the trial, on behalf of the respondent an offer was placed on record to sell to the complainants at $12.00 a share all or any part of the shares received by Hillman Coal and Coke Company under the plan of refinancing, the offer to remain open until the close of the hearing. No stockholder availed himself of the offers.

The terms of the contracts with Pittsburgh Steel Company and Pittsburgh Coke and Iron Company required the respondent to sell to, and the two contracting companies to buy, not less than 80% of their yearly requirements for high volatile coal for consumption at certain of their plants for a period of twenty years, at a fixed price for the first year, and thereafter at competitive prices, with a provision for arbitration in the event of dissatisfaction.

The learned Vice-Chancellor properly applied the rule laid down by this court in *Keenan v. Eshleman*, 23 *Del.Ch.* 234, 2 *A.2d* 904, 120 *A.L.R.* 227, that the contracts being

between corporations having directors in common, the proponents of the transaction must assume the burden of showing its entire fairness both with respect to the plan of refinancing and the concomitant contracts.

At $12.00 a share for the stock, the respondent's coal lands had a value of $238.49 an acre. The complainant's contended that this was beggarly value, as, in reality, they had a value of $1000.00 an acre. This value was based largely upon evidence of large prices in sales or leases of coal lands in and prior to 1930; the opinions of persons expressed in that year, the value of leases of certain other mines, notably the Rainey and Gibson leases, the advantage of access to water transportation, and the alleged near exhaustion of coal fields along the River.

The respondent, on the other hand, contended that a fair average value of the respondent's field was from $238.49 to $250.00 an acre. In this aspect of the controversy, the Vice-Chancellor considered actual sales of coal lands in nearby fields; evidence relating to other tracts sold or leased in 1940 at prices per acre much exceeding the value put upon the respondent's lands by Mr. Hillman and his associates, and their earlier opinions of a much higher value of the lands. He found satisfactory the explanation given by them of their change of opinion, namely the depression of 1930 and its effects, the failure, despite repeated efforts, to find a buyer for the respondent's lands, the unionization of coal mines in the district in 1933 and the consequent increase in production costs, the fact that in 1939 the operator of the Rainey mine became a voluntary bankrupt, and the discovery that the coal in certain portions of the respondent's field was of dubious quality. The Vice-Chancellor carefully considered apparent inconsistencies with respect to assertions of value made prior to the transaction and found that they had been in a large measure explained, and at all events wholly insufficient to demonstrate that the issuance of the new stock at $12.00 a share was unfair because of the great

value of the coal lands. He examined the complainant's thesis that the fairness of the price for the new stock was primarily dependent upon the value of the company's assets, and correctly held that the question of a fair price at which to sell property is a matter of opinion dependent on facts and reasonable implications therefrom. Recognizing that the book value of $99.00 a share for the old stock and the value of the corporate assets when the plan was proposed and approved were considerations not to be disregarded, he properly held that the primary conception of value was that value which was effective to enable the corporation to obtain money, either by selling or leasing its lands, selling its stock, or by borrowing. He noted the unsuccessful efforts which had been made to sell the property; that a loan from the Reconstruction Finance Corporation had been obtainable only on impracticable conditions; that the stockholders themselves had been unwilling to make further investments in the stock even at $12.00 a share, except to the extent of thirteen shares, or $156.00; that the book value of the old stock furnished no evidence whatever of the willingness of persons to invest their money in the company's stock; that the shares were not listed on any exchange; that one stockholder, desiring to sell his stock, had found no buyer; that some sales had been made at $5.00 a share; that one broker advised that a nominal value of $5.00 a share was bid; that the company's earning power was yet to be demonstrated; and that no other reasonable or practicable plan of refinancing had been offered.

Plainly the financial condition of the respondent demanded speedy action. The stockholders offered no relief. The Vice-Chancellor viewed the question before him as one of actual or practical value as opposed to theoretical value, and from a careful analysis of the evidence and appraisal of relevant factors concluded that $12.00 a share for the new shares was a fair value therefor in the light of the circumstances.

The complainants contended that the two steel companies would become large shareholders in the corporation, and that its mine would be reduced to the state of a captive mine. The respondent urged that the alternative to finding a purchaser for the respondent's coal lands was to interest large companies in purchasing coal thereby to insure the sale of coal produced, and also to persuade consumers of coal to invest money in the respondent's enterprise. The Vice-Chancellor pointedly observed that if the stockholders had been willing to exercise their subscription rights, they could have maintained their voting power; and he found no occasion to assume, and certainly there was no evidence, that the purchasers of the new stock would, as shareholders, exercise their voting power unfairly.

The great weight of the testimony given by the witnesses, one of them the complainant's own expert, was to the effect that the contracts with the two steel companies were definitely beneficial to the respondent. The Vice-Chancellor found in accordance with the weight of the evidence; and he observed that after the suit had been brought and the complainant's objections had been made known, a majority of the independent stockholders approved the plan of refinancing in its entirety, thereby removing from the field of discussion doubt concerning the value of assets or of the new stock, the desirability of the contracts, and the fairness of the plan of refinancing in general.

The opinion of the Vice-Chancellor is thoroughly satisfactory. His findings of fact and conclusions were based upon a searching appraisal of the testimony before him and, being amply supported by the evidence, will not be disturbed. *Chalfant v. Reinhardt*, 12 *Del.Ch.* 389, 113 *A.* 674; *New York Trust Co. v. Riley*, 24 *Del.Ch.* 354, 16 *A.2d* 772. For no other purpose than to make understandable our conclusions with respect to other phases of the controversy have we thought it necessary to review briefly the material facts of the case.

After entry of the decree of dismissal, the complainants petitioned for leave to file a bill of review on the ground of newly discovered evidence, and before hearing on their petition they took their appeal from the decree of dismissal to this court. The pendency of the appeal was not urged as an objection to the application. The Vice-Chancellor advised that the petition be dismissed, 27 *Del.Ch.* 264, 34 *A.2d* 869; and a decree to that effect was entered. The complainants have appealed from this decree also.

This court, *In re Missouri-Kansas Pipe Line Co.*, 24 *Del.Ch.* 215, 2 *A.2d* 273, 278, stated the rules governing an application to file a bill of review on the ground of newly discovered evidence in this language:

"The applicant is required to show that the newly discovered evidence has come to his knowledge since the trial; that it could not, in the exercise of reasonable diligence, have been discovered for use at the trial; that it is so material and relevant that it will probably change the result if a new trial is granted; that it is not merely cumulative or impeaching in character; and that it is reasonably possible that the evidence will be produced at the trial."

We also said in that case that it must appear that the evidence is newly discovered, and not merely that it is important; and that the petitioner is required, under the rule of diligence, to find and inquire of persons known or supposed to have participated in the act or transaction in controversy, or to have had some communication therewith, or knowledge thereof, as to their knowledge in fact.

The alleged newly discovered evidence consists of certain portions of testimony given at a hearing held at Washington in January, 1943, before an Examiner of the Bituminous Coal Division of the Interior Department of the United States, upon the respondent's application for approval of the contract of January 10, 1942, between the respondent and Pittsburgh Coke and Iron Company.

The evidence relied upon is said by the complainants to amount to admissions against interest, constituting inde-

pendent substantive evidence so persuasive and controlling as to require a review, although, incidentally, it may contradict or impeach the respondent's testimony given at the trial; and they insist that the refusal of leave to file a bill of review was an abuse of a sound equitable discretion.

The broad theory is that the evidence given on the respondent's behalf at the trial depreciated the value of the respondent's coal lands, while the testimony given at the Washington hearing exalted their value; and the contention is that eight important conflicts or inconsistencies resulted, the cumulative effect of which compels a retrial of the case in the interest of justice.

The first alleged conflict is with respect to the value of the respondent's coal lands as affected by the availability of other sources of supply. It is insisted that the Hillman position at the trial was that no special value was attributable to the respondent's lands because of shrinkage of competitive sources of supply, for the reason that Hillman could have met the requirements of Pittsburgh Coke and Iron Company from sources other than the respondent; while at the Washington hearing the testimony of the respondent's officers, directors and stockholders constituted admissions that these other sources of supply did not exist, or were not available, or were, in fact, competitive with the respondent.

The complainants assert that William F. Affelder, director and vice-president of the respondent, in giving testimony at the trial disregarded his obligation to act in good faith with the court and his express obligation to tell the whole truth. They point out that the Hillman Coal and Coke Company was under obligation to furnish Pittsburgh Steel Company and Pittsburgh Coke and Iron Company with their requirements for coal for twenty years, amounting to 20,-000,000 tons, and they charge that Mr. Affelder testified that these requirements could have been supplied from the Naomi and Pike mines of the Hillman Coal and Coke Company, al-

though he well knew that these mines had at most only two or three remaining years of life. A sufficient answer to this serious charge is that the testimony of the witness, fairly considered, was not that the required coal could have been supplied from the Naomi mine, or the Pike mine, or both of them, but could have been supplied from these mines and the Oakmont mine and from such other property as might be necessary to acquire and develop. From the viewpoint of a petition for leave to file a bill of review on the ground of newly discovered evidence, which is dependent upon a showing of reasonable diligence, more may be said. It was agreed that 8000 tons of coal is a fair average yield per acre. 2500 acres of coal lands would be necessary to supply 20,000,000 tons of coal.

The complainants well knew from their own exhibits that the Naomi and Pike mines had very small unexhausted acreages and correspondingly short lives; but in answer to the charge that by the exercise of reasonable diligence all of the facts concerning the two mines could have developed in the cross-examination to which the witness was subjected, they reply that they were under no duty to cross-examine the witness at all. In the abstract this is true, but new trials based on newly discovered evidence require a showing of diligence; and not withstanding the general observations of the court in *White v. Nafus,* 84 *Iowa* 350, 51 *N.W.* 5, we do not understand from that decision nor from any of the decisions cited by the complainants that a party is never under duty to cross-examine an adversary witness. *Brennan v. Goodfellow,* (*Iowa*) 96 *N.W.* 962, for example, is directly to the contrary; and the other cases cited present some exceptional circumstances held sufficient to excuse the failure to cross-examine. *Buford v. Bostick,* 50 *Tex.* 371; *Bonynge v. Waterbury,* 12 *Hun,* (*N.Y.*) 534; *Stokes v. Stokes,* 34 *App. Div.* 423, 54 *N.Y.S.* 319; *Nantz, et al., v. Sizemore, et al.,* 156 *Ky.* 539, 161 *S.W.* 552; *Henderson v. Edwards,* 191 *Iowa* 871, 183 *N.W.* 583, 16 *A.L.R.* 1090; *Vick v. Schaff,* (*Tex. Civ.App.*) 260 *S.W.* 916; *Wilbur v. Iowa Power & Light Co.,*

223 *Iowa* 1349, 275 *N.W.* 43; *McClelland v. Mounger* (*Tex. Civ.App.*) 107 *S.W.2d* 901; *Steed v. Winder,* (*Tex.Civ.App.*) 130 *S.W.2d* 403.

The general rule is that witnesses must be examined fully and specifically as to their knowledge of all material matters in controversy; and where a witness has in fact testified at the trial, a rehearing based on evidence which could have been elicted by a proper examination will be refused except in a very strong case. The rule has been said to apply to the examination of an adversary witness, 46 *C.J.* 260, and so the rule seems to be in the absence of unusual circumstances. *Missouri, K. & T. R. Co. v. Rack,* 21 *Tex. Civ.App.* 667, 52 *S.W.* 988; *Neff v. Cameron,* 213 *Mo.* 350, 111 *S.W.* 1139, 18 *L.R.A.*(*N.S.*) 320, 127 *Am. St. Rep.* 606; *Gerth v. Christy,* (*Mo.App.*) 231 *S.W.* 639; *Bosek v. Detroit United Railway,* 175 *Mich.* 8, 140 *N.W.* 978; *Brennan v. Goodfellow, supra; Poullain v. Poullain,* 79 *Ga.* 11, 4 *S.E.* 81; *Bowling v. Floyd,* 5 *Kan. App.* 879, 48 *P.* 875; *Morrison v. Carey,* 129 *Ind.* 277; 28 *N.E.* 697; *Zimmerman v. Weigel,* 158 *Ind.* 370, 63 *N.E.* 566. No rigid rule can be laid down. Diligence must be shown; and what is diligence in a particular case depends upon a reasonable likelihood of knowledge on the part of the witness actually examined or who is available for cross-examination and consequently, a reasonable probability of discovery of facts by cross-examination. Where, as here, an adversary witness has testified contrary to known fact, as it is claimed, the cross-examiner may proceed to establish the contradiction, to reconcile the apparent inconsistency, or to force a retraction. He may not leave the matter dormant, and thereafter make the fact already known to him the basis for a new trial on the theory that it constitutes evidence newly discovered. If such were allowable, there would be no end to litigation.

The complainants insist that respondent's counsel concealed from the Vice-Chancellor the fact that Bituminous Coal Division had issued a ruling that the Pittsburgh Steel

Company option was in contravention of its Marketing Rules and Regulations. No comment is needed except to say that there was no concealment of the fact as the record plainly shows; it does not appear that the Vice-Chancellor was misled; and the importance of the contention is not apparent.

It is asserted by the complainants that the primary motivation of the respondent's contract with Pittsburgh Coke and Iron Company was Hillman's necessities rather than the respondent's advantage; and in support of this contention particular reference is made to the testimony given at the Washington hearing by R. M. Marshall, director and executive vice-president of Pittsburgh Coke and Iron Company, and at that time, but not at the time of the trial, a director of the respondent. It is claimed that portions of Mr. Marshall's testimony are contradictory of the testimony given at the trial by Mr. Hillman and Mr. Affelder with respect to the value of the respondent's coal lands; and that his testimony has a peculiar significance in two particulars: first, that, although one of the respondent's directors, he directed all of his testimony toward the desirability, if not the necessity, of the respondent's contract from the standpoint of Pittsburgh Coke and Iron Company without stating, or even implying, that the contract was even remotely beneficial to the respondent; and, second, that he testified that his information as to the availability of adequate coal supplies was obtained from Mr. Hillman, and, therefore, his testimony was but a reflection of Mr. Hillman's knowledge or opinions. And, it is contended that the admissions made by him are binding upon the respondent.

The issue at the Washington hearing was whether permission should be granted for the execution of a twenty year contract. Desirability of the contract from both the standpoint of the producer and consumer was a relevant matter. Mr. Marshall was called to testify from the consumer's standpoint. His failure to testify that the contract was beneficial to the respondent does not allow the inference

that it was not, in fact, beneficial. Certainly, the complainants had full opportunity to elicit the witnesses' opinion, if they had thought it important. Mr. Marshall said explicitly that he was not in a position to comment on the available coal in the Pittsburgh district as a whole for the reason, as he said "I haven't lived with it a long time. I have had no experience in trading in coal properties or making a study of available coal acreages." Despite this disclaimer of knowledge and experience, the complainants insist that as his information was obtained from Mr. Hillman, and as he was a director of the respondent, his statements constitute admission on the part of the respondent through Mr. Marshall's mouth, or through Mr. Hillman's mouth as testified to by Mr. Marshall. Neither contention is supportable. There is no evidence whatever that Mr. Marshall was acting as the authorized agent of the respondent at the Washington hearing. Whatever he said was not binding on the corporation or admissible as evidence against it. 2 *Fletcher, Cyc. Corp.*, § 741; *Colvocoresses v. W. S. Wasserman Co.*, 8 *W. W. Harr.* (38 *Del.*) 253, 190 *A.* 607. To whatever extent Mr. Marshall reflected Mr. Hillman's knowledge and opinions was but hearsay. Moreover, and what is important is the fact that any conflict between Mr. Marshall's testimony at Washington and the testimony given at the trial by Mr. Hillman, is unsubstantial.

The complainants charge also that at the Washington hearing, William F. Achhammer, vice-president of Hillman Coal and Coke Company, admitted that his company could not without difficulty supply the combined requirements of Pittsburgh Steel Company and Pittsburgh Coke and Iron Company from mines of the Hillman group other than the respondent's mine. The witness did not testify at the trial. He was called by the complainants at the Washington hearing as their own witness. No explanation is offered of the failure to produce the testimony of the witness at the trial. Want of diligence is manifest.

The second alleged conflict involves the value of the respondent's coal lands as affected by the quality of the coal in its field.

The argument runs in this fashion: At the trial a great deal of testimony was introduced by the respondent to the effect that a substantial part of the recoverable coal in the respondent's field would have a sulphur content too high for metallurgical use, thus reducing the coal lands in value; and that the evidence had its natural effect upon the mind of the Vice-Chancellor, who observed that the high content of sulphur in the coal of an adjoining tract and the discovery of small areas of such coal in the respondent's field cast some suspicion concerning the untested portion of such field. In conflict with the evidence and the Vice-Chancellor's statements in respect of it, the complainant's offer as newly discovered evidence the opening statement of Thomas Watson, Esquire, one of the respondent's counsel at the Washington hearing, that the respondent's coal was "high volatile coal, with a low sulphur content, suitable for manufacture of blast furnace coke, and also for gas production."

Mr. Watson did not testify at the trial. He had no official connection with the respondents except as counsel; but the complainants counter by calling attention to the fact that he was director or officer of various Hillman corporations, and also, that the statements made by him as the respondent's counsel were binding upon it as made by its agent in the discharge of the duties of his agency.

We fail to find merit in this contention. The quality of the respondent's coal was not an issue at the Washington hearing, nor was the fairness of the issuing price of the respondent's stock as related to the value of its coal lands an issue. A prefatory statement by counsel, not intended to be a qualitative description of the respondent's coal, does not, in any proper sense, constitute an admission against interest, especially in an independent proceeding involving different issues. Moreover, the suitability of the respond-

ent's coal to the manufacture of iron and steel as evidence of the value of the respondent's coal lands was an issue before the Vice-Chancellor upon which much evidence was given.

The complainants further contend that Mr. Marshall's testimony at Washington that, in the process of coking, practically all of the organic sulphur is removed from the coal in the coking ovens, completely nullifies the testimony adduced by the respondent at the trial as to the percentages of sulphur found in coal taken from the respondent's lands without differentiation between organic and inorganic sulphur. An extended examination of the evidence given at the trial, as compared with Mr. Marshall's testimony, fails to make clear the alleged contradiction. There was a great deal of testimony given by experts on methods of removing sulphur from coal. The statements of Mr. Marshall, however, considered, were in no sense admissions against the respondent's interest; and if considered as binding on the respondent, are but cumulative.

The third alleged conflict is with respect to the value of the respondent's lands as affected by calculations of comparative costs of loading coal on the river. The conflict is said to result from statements made by Mr. Affelder upon cross-examination at the Washington hearing on a method of comparative calculation between the Ontario mine of the appellants and the respondent's mine. At the trial the method was employed by the witness as between the Rainey-Clyde mines and the respondent's mine, which were adjoining mines with access to the river. At the Washington hearing the same method of comparative calculation was urged upon the witness with respect to a land-locked mine, despite the protests of the witness that the situations of the two mines were so entirely dissimilar as to make a comparative calculation absurd. The Vice-Chancellor, very properly, held that the alleged newly discovered evidence was not inconsistent with the respondent's evidence at the trial, and fell short of being so material and relevant as to make prob-

able a change in the result if introduced at a retrial of the case.

The fourth, fifth, sixth, seventh and eighth alleged conflicts are concerned for the most part with charges foreign to the complaint. They have to do with the good faith of the Hillman interests in acquiring an interest in the respondent, their good faith in not developing the coal lands in the ten years, 1930 to 1940, their good faith in respect of inaccurate representations made as to the state of the development of the property, their good faith in representing the necessity for long term contracts, and their good faith in respect of self dealing.

The complainants contend that the Hillman interests were allowed to purchase a substantial interest in the respondent in 1930, and to manage its affairs, upon an express understanding that the management would develop the property until it could be sold or made sufficiently income producing to carry itself. This claim rests upon the assertion of one of the complainants. There is no written agreement or memorandum, and it would seem reasonable that such an understanding involving great outlay of money, even for the necessary carrying charges, would not have been allowed to rest upon an infirm evidential basis. The charge is flatly denied; and the Vice-Chancellor specifically found against the existence of such an understanding or agreement, in this language:

"I cannot find that any of the circumstances present gave rise to any obligation or duty on the part of Mr. Hillman and his associates to continue to furnish funds, or to abstain from attempting to find someone else to help shoulder the burden they had carried in the past, and share in the burden which the future would inevitably bring."

We see no material conflict in the statement made by Mr. Affelder at the Washington hearing, that Mr. Hillman acquired an interest in the respondent to expand generally his interest in the coal industry, and Mr. Hillman's state-

ment at the trial that his purpose was to develop the property and then sell it. Unsuccessful efforts were, in fact, made to sell the property. Failure so to do required another course of conduct. The testimony does not warrant the complainant's assertion that the development of the property was deliberately delayed, and there is nothing in the evidence to suggest that the complainant complained of non-action in this regard.

The statement made in the prospectus of June 17, 1941, that the respondent's mine had forty-two miles of developed entries whereas, in fact, it had sixty-two miles on that date, was an error of the respondent's engineers to which attention was called by Mr. Affelder himself at the Washington hearing. The complainants do not contend that they refused to exercise their subscription rights because of the error, and, at best, it has little or no importance.

The evidence was that the sales price of the respondent's coal is the maximum price permitted under the regulations of the Office of Price Administration, and was as high as that of any mine similarly situated in the particular district. At the trial it appeared that the complainants had in employ a firm of public accountants who spent two months in examining the respondent's books and records. All of the facts relating to prices could have been brought out at the trial, and none of the evidence in this respect qualifies as newly discovered.

As a result of the plan of financing and the contracts, the consumers of the respondent's coal will have a constant supply of coal, but they will not control the respondent's operations. Each year, the contracts may be reconsidered in the light of existing conditions, and a fair competitive price for coal agreed upon. In none but a highly argumentative sense is the respondent's mine reduced to the status of a captive mine, and the courts are open to future complaints of inequitable dealings between the corporations having interlocking directors.

The issue at the trial was the fairness of the plan of refinancing in the then prevailing circumstances. Possibly the respondent's thoroughly unstable financial condition had been brought about by maladministration; but mismanagement was not charged, nor was Mr. Hillman or any of his associates made a party defendant. The complainants, with full knowledge or means of knowledge, voiced no objection to management so long as the Hillman interests supplied the needful money. Nevertheless, interwoven in the argument is the insinuation, if not actual charge, foreign to the issue and unsupported by evidence, that the plan of financing by which the three corporations acquired substantial stock holdings in the respondent company was the result of a crafty design, carefully nurtured through the years, to enable the Hillman interests to obtain control of the respondent to their own advantage; and the innuendo is constantly used to give a suspicious color to the testimony given on behalf of the respondent. But, upon examination, the evidence submitted as newly discovered, and so controlling and persuasive as to render a different result reasonably certain if a review should be ordered, is a composite of trivialities, irrelevancies, cumulations and unimportant inconsistencies dignified as admissions against interest, offered in the hope, as it would seem, that if a rehearing is granted, the complainants will be able to introduce in evidence much that could have been produced at the trial if reasonable diligence had been used, and to cross-examine adversary witnesses more specifically and, perhaps, more effectively; and we are asked to brand as an abuse of discretion the entirely legitimate refusal of the Vice-Chancellor to order a review upon offers of evidence of most dubious and uncertain value.

The Vice-Chancellor, in his opinion last cited, observed that while there were apparent inconsistencies resulting from the testimony given at the Washington hearing, the most of them disappear upon a careful reading of the entire relevant portions of the testimony given at each hearing; that except in unimportant details the alleged inconsisten-

cies relate to matters of opinion or prognostication by no means determinative of the ultimate issue whether the plan of refinancing was in the circumstances fair; that the suitability of the respondent's mine as a source of supply for the needs of the contracting companies, the absence of other suitable single mines, and the difficulty which the Hillman group might have had in supplying the coal called for under the contracts, all tend to show the desirability of the respondent's lands, and a monetary value for them, but furnished no answer to the question whether the plan was fair. But, as he went on to say, these are all theoretical factors of value which were insufficient to induce any one, including the respondent's stockholders, to pay more than $12.00 a share for the new stock; and that the remoteness of realization of income, coupled with existing financial difficulties and a long history of repeated necessities for additional capital should account largely for the relatively lower valuation of the stock in the minds of those who might be willing to risk their money in the venture.

We are in entire accord with the Vice-Chancellor's view.

The decree dismissing the bill of complaint was entered on November 27, 1942. The complainants took their appeal on May 26, 1943, one day before the termination of the six months' period allowed for an appeal. The Vice-Chancellor's opinion advising that the petition for leave to file a bill of review be refused was filed on December 8, 1943, and an order dismissing the petition was entered on December 29, 1943. On the day before they took their appeal from the decree dismissing the bill of complaint, the complainants filed their petition for leave to file a bill of review; and it was not until the eighth day of June, at the June Session of this court in the present year, that a petition was presented asking leave to amend a proposed bill of review.

The respondent, in its answer, avers that the petitioners have been guilty of gross laches throughout the proceeding, and especially with respect to the petition for a bill of re-

view and to the petition presented here to amend the bill of review. They aver that the petition for leave to file a bill of review was based solely and exclusively on evidence adduced at the hearing before the Bituminous Coal Division at Washington, which was concluded on January 27, 1943; that they failed to present the bill of review to the Vice-Chancellor until May 25, 1943; that the petitioner, Joseph W. Kennedy, was on notice of the transactions which are the subject matter of the present petition to amend the petition, on December 8, 1943, and had detailed information with respect to them on February 10, 1944; and that the delay on the part of the petitioners to prosecute their petition in chief and their amendatory petition was deliberate, to harass the respondent, and to extend the proceeding in the hope that some new fact might be discovered which would form the basis of a further application to reopen the case.

The petitioners, in reply, deny undue delay and attempt to excuse what, at first glance, would seem to be an unreasonable protraction. The merits of this phase of the controversy will not be examined.

The petition filed in this court praying for leave to amend the bill of review is based upon a lease by the respondent of a part of its coal lands to Republic Steel Corporation, bearing date September 1, 1943, and filed of record on January 7, 1944. The lease embraces 2200 acres of the respondent's lands on a royalty basis of eighteen cents for each ton of coal mined and removed from the lands during the term of the lease; and it contains an option to purchase the lands so leased at varying yearly prices up to and including September 1, 1969, the option price for September 1, 1944, being $700.00 an acre plus one year's interest at 4%.

Two distinct tracts were embraced in the lease. Tract A containing 1200 acres, and Tract B 1000 acres. The respondent, in its answer, alleged, and it seems not to be denied, that of the first tract 400 acres were not owned by it

at the time of the trial, and that the net acreage withdrawn from the respondent's field as it existed at that time was somewhat less than 500 acres, or less than 1/20 of the whole; that this acreage was a part of 3000 acres nearest the shaft which Mr. Hillman characterized as "the short haul coal and the best quality coal with a value of $500.00 per acre"; and that the opportune leasing or sale of a portion of the respondents coal lands to Republic Steel Corporation was due to the fact that this portion of its field immediately adjoined the lessee's mining operation admitting the reception of the coal through the lessee's mine and thereby avoiding a wheeling charge of $280.00 an acre applicable otherwise to the respondent's coal. It is pointed out, moreover, that economic and financial conditions had changed in the meantime, and it is submitted that the sale price of the lands leased has no true bearing on the fair value of the respondent's field as a whole as it existed at the time of the original suit. There are other factual averments relating to the real amount or value of the consideration received, or to be received, by the respondent as a result of the transaction which are unnecessary to detail.

The basic issue at the trial was whether the plan of refinancing was, in the circumstances, fair and equitable. An incidental factor embraced in the issue was the fairness of price for the new stock, as denoting the value of the coal lands. The facts presented by the instant pleadings must be considered in the light of the circustances existing when the refinancing plan was adopted. Between that time and the time of the lease there was an interval of more than two and one-half years. During that interval we became wholly engaged in world-wide war, necessitating the employment of all of our resources. Industrial activities were enormously expanded; demands for coal were abnormally increased; exhaustion of coal producing lands was greatly accelerated; inflation of values was inevitable. The complainants urge a retrospective view. What they seek by the proposed amendment is an opportunity to retry the case

upon theories of value based upon vastly different economic and financial conditions. Doubtless many transactions entered into in 1940 would not have been considered favorably had the future been foreseen or reasonably forseeable. Wisdom after the event is a cheap purchase. Evidence of acts or events occurring subsequent to the trial may, in some cases, properly be viewed as newly discovered evidence, 39 *Am.Jur.* 180; although, in strictness such evidence is newly created, rather than newly discovered. *Herrman v. Altman,* 139 *App.Div.* 930, 124 *N.Y.S.* 39. The authorities are not entirely in agreement; but where the acts or events, although after occurring, are reasonably demonstrative of a condition which existed at or before the trial, there seems to be no sound reason why they should not be accepted as newly discovered evidence. *Southard v. Bangor & A. R. Co.,* 112 *Me.* 227, 91 *A.* 948, *L.R.A.*1915*B,* 243; *Bridgham v. Hinds,* 120 *Me.* 444, 115 *A.* 197, 21 *A.L.R.* 1024. See note to *Guth v. Bell, Ann.Cas.*1913*E,* 147. Here the after occurring transaction, as it is supposed to reflect the value of the coal lands at the time the plan of refinancing was adopted, was in such a changed condition of things as to be utterly irrelevant to the issue presented to the court below.

We have not failed to consider the multitude of facts and inferences from facts and the arguments advanced by the complainants in their voluminous briefs. To comment upon all of them would result in an opinion of inordinate length, and would serve no useful purpose. It is sufficient to say that the learned Vice-Chancellor has dealt ably and fairly with the questions before him.

The decree dismissing the bill of complaint is sustained; the decree dismissing the petition for leave to file a bill of review is sustained; the petition filed originally in this court for leave to amend the bill of review is dismissed.